Osborn, J.
For greater convenience, I shall in this opinion style the party making the motion, William Kortz, as the relator, and the board of canvassers as respondents. So that when the word “relator ” or the word “respondent” is used, there will be no difficulty in understanding to whom allusion is made. The facts sufficiently appear in the opinion and a separate statement thereof is unnecessary. They may be briefly stated as follows:
At the last general election, held November 7, 1882, four coroners were by law to be elected for the county of Greene, to hold such office respectively for the three ensuing years. That as appears by the returns on file in the Greene county clerk’s office, as properly returned by the inspectors of election in the several election districts of said county, the relator received 8672 votes, Andrew H. Getty received '3292 votes, and one Andrew C. Getty, 603 votes. That on November 17, 1882, the respondent, while properly in session and while engaged in the performance of its duty, resolved that the vote of Andrew G. Getty be counted for Andrew C. Getty. This was precisely in accordance with the returns. On the next day, this vote was reconsidered and no further action was taken until the 21st of November, when the respondent passed the following resolution: “ Resolved, that the several votes and ballots cast at the last general election in Greene county, returned to this board for coroner for Andrew H. Getty, Andrew Getty and Andrew G. Getty, were intended for and that the same be counted and estimated for the-said Andrew II. Getty.” This was carried by a vote of-nine to five, and the same were thereupon so counted and estimated. It appears from the returns and from the affidavit of the relator, and was conceded upon the argument, that no votes appear as having *86 been cast for Andrew Getty. The facts stated thus far appear upon the face of the returns and the affidavit, and are not disputed, and so may be assumed in the disposition of this case. A further reference to this affidavit will be made hereafter.
No question arises in reference to the election of three of the coroners, so that it will be seen that the present controversy is narrowed down to a single issue, viz., were these votes cast for Andrew C. Getty, properly counted, estimated and allowed by the respondent as for Andrew H. Getty ? If so then Andrew H. Getty is entitled to the usual certificate. If not, then it appearing that the relator received more votes than either Andrew 0. Getty or Andrew H. Getty separately, he, the relator, is entitled to the certificate, and the party feeling himself agrieved must resort to an action in the nature of a quo warranto to show if possible his right to such office.
The motion comes before me on an order issued by Mr. Justice Westbrook upon the affidavit of the relator under and in pursuance of chapter 460 of the Laws of 1880, requiring the respondent to show cause why the votes cast for Andrew C. Getty should not be counted for Andrew C. Getty in accordance with the returns as made to and appearing before the board of canvassers, and not for Andrew II. Getty, and why the certificate of election should not be awarded to the relator.
In this discussion, two legal propositions are involved, and will be considered separately. 1st. As to the duty of the respondent upon the face of the returns as appearing in the clerk’s office, and presented to it for appropriate action to be taken thereon.
2d. Has the court, on this motion, any power to go behind the returns, or to compel the board by mandamus, to do any act, which it ought not to have done nor could legally do without such order or direction ?
*87 I shall consider these propositions in the order stated.
The general duties of the respondent are clearly-defined by statute and may be found collated in the Election Code, certain sections of which I refer to as more convenient for reference than thó statute itself. The manner of organization, &c. (as to which no question is here raised), may be found in the Election Code, sections 299-306, inclusive. After being organized, section 307 provides as follows:
> “ The original statements of the canvass in each district shall then be produced, and from them the Board shall proceed to estimate the votes of the county, and shall make such statement thereof, as the nature of the election shall require; such statements shall then be delivered to and deposited with the county clerk.”
Section 311. “Upon the statement of votes given for members of assembly, and county officers, the Board shall proceed to determine what person or persons have, by the greatest number of votes, been duly elected to each of the offices mentioned in such statement.” The same statutory provision substantially as to the duty of a board of county canvassers applies to the board of state canvassers. Section 336 of the Election Code gives the language of such statute, and is as follows: “Upon such statements they shall then proceed to determine and declare what persons have been, by the greatest number of votes, duly elected to such offices, or either of them.” It will, therefore, be seen, as was well and properly stated by the learned counsel for the relator on the argument before me, and in his brief, that the language declaring-the duties of a board of county canvassers and those of a board of State canvassers are substantially identical. It follows, therefore, that any authority giving construction to one, is equally applicable to the other.
It is clear, upon authority, that the duty of a board *88 of canvassers is principally ministerial; but I am not prepared to give my assent to the great length to which some of our ablest jurists have gone in opinions written, some of which will be referred to hereafter. These remarks were not necessary to the proper determination of the question or questions presented for adjudication, and may be regarded as obiter simply. Many cases could be cited where the courts have authorized and upheld the action of a board of canvassers, in giving effect to well-known abbreviations of names, as that “ Wm.” stands for “ William,” “ Geo.” for “ George,”. “Abm.” for “Abram,” or “Abraham.” In doing this and so declaring, the act is in its nature judicial, as no statute authority gives in terms any such direction or power (Election Code, § 698; People v. Cook, 8 N. Y. 61; Morgan v. Quackenbush, 22 Barb. 72 ; Exparte Heath, 3 Hill, 247)
No pretense is made, nor can one be successfully made on authority, that a board of canvassers can assume judicial powers to the extent of trying the title of different claimants to an office. It has no power to summon witnesses or compel their attendance ; nor would it have the power to hear the evidence of witnesses who volunteered their attendance ; nor has it power to hear affidavits or any proof of any character upon which any action or decision could be based. As we have seen, the duties of a hoard of canvassers are fixed by statute, and proof aliunde the returns, or to contradict them, is not permissible. The question then, sharply put, comes to this : Had the respondent the right to assume the power in the absence of proof (which it could not legally hear, either by affidavits or oral testimony), that the votes cast for and returned Andrew 0. Getty should be counted and allowed to Andrew H. Getty, and that such votes were intended by the voters so casting the same for Andrew H. Getty %
It may seem strange that no case to which I have *89 been referred, or that I have been able to find in my researches, seems to me entirely authoritative and conclusive on this question. The case of People ex rel. Welch v. Cooke,,which is relied upon by the counsel for relator and also by counsel for respondent, and to which frequent reference was made on the argument, and which has long been regarded as a leading case, as an adjudication of very many important questions, is one more nearly in point than any other which can be found. A brief reference to the facts in that case, as well as what was there held, may be important. The case is first reported in 14 Barb. 259. Benjamin Welch, Jr., and James M. Cooke were respectively nominated for the office of State treasurer. In some localities, through a mistake in the printing of the tickets, as appeared in the action, many votes were cast for Benjamin C. Welch, Jr.; and others for Benjamin Welch. In'Naples and Gorham, in the county of Ontario, the votes that were cast for Benjamin C. Welch, Jr., were awarded by the board of county canvassers to Benjamin Welch, Jr., the actual candidate. In other localities the board of county canvassers certified and counted the votes precisely as they appeared upon the face of the returns. The State canvassers awarded the certificate of election to Cooke, refusing to go behind the returns as certified by the different boards • of county canvassers. An action was brought by Welch, in the nature of a quo warranto to oust Cooke, and to declare him (Welch) elected to such office. It appeared on the trial that it required all the votes that were cast for Benjamin-C. Welch, Jr., and Benjamin Welch to be allowed for him in order to show that he had more votes than had been cast for Cooke, to whom the certificate had been warded ; and then only by a small majority. On the trial at the circuit, it appeared that the votes cast for Benjamin C. Welch, Jr., and for Benjamin Welch were intended by *90 the voters to be east for Benjamin Welch, Jr., and that the mistake occurred in the printing of the tickets. The judge at the circuit held that upon the proof as it appeared upon the trial, all these votes should be allowed to Benjamin Welch, Jr., and that the inspectors of election in the towns of Naples and Gorham, in the county of Ontario, acted properly in awarding the votes appearing for Benjamin C. Welch, Jr., to Benjamin Welch, Jr., but stated in substance that as the question was now up before the court it could take proof, as it did, aliunde the returns as to the intention of the voters and as to how the mistake occurred, viz., in the printing of the tickets.
Cooke appealed to the general term, and the court, at page 308 of opinion (14 Barb.) made use of the following language: “ The judge at the circuit decided that the votes in the towns of Naples and Gorham, Ontario county, were intended for Benjamin Welch Jr., and were properly canvassed as such.” To this ruling the defendant Cooke excepted. The court then goes on to say, “ I am inclined to think.that the judge at the circuit decided correctly in allowing this canvass to stand in these towns, upon the evidence given in the case. The duty of the inspectors, as well as the county and state canvassers, partakes of a two-fold character, as some of their duties are judicial and others ministerial.’ ’
It also appeared on the trial that in the town of Richmond, Ontario county (page 306), the whole number of votes cast for state treasurer was 276 of which 109 were cast for Benjamin Welch, Jr., and 32 for Benjamin C. Welch, Jr., and that these 32 votes were not allowed either by the county or state canvassers. Various other questions arose on the trial, and were discussed and decided at general term, which have no application to the case at bar. It will thus be seen that at the circuit and general term, language was used from which it might be inferred that a board of *91 county canvassers had the power to award the votes given to Benjamin C. Welch, Jr., and for Benjamin Welch, to the actual candidate, Benjamin Welch, Jr.; but in each instance such language was qualified substantially by the statement, that whether so or not (which was not necessary to decide), the court clearly, in the action and on proper proof, could decide and determine that all such imperfect and defective ballots could and should be awarded to the person for whom they were evidently intended. From this decision and judgment, which gave Welch the office and ousted Cooke, the latter appealed to the court of appeals. The case is there reported in 8 N. Y. 671, where an exhaustive opinion was written by Willard, J., and adopted as the opinion of the court. A few quotations will suffice. On pages 80 and 81 the court says, in reference to the opinion in the court below “It was unnecessary to decide that these defective ballots should have been allowed and canvassed by the State canvassers. The court did not say, as matter of law, irrespective of the extrinsic facts proved, that Benjamin C. Welch, Jr., and Benjamin Welch without the Jr. meant Benjamin Welch, Jr. It was the extrinsic evidence that made the intention of the voter obvious.”
Again, the same learned judge says : “In my own opinion the State canvassers act ministerially in the main in making their certificate. They cannot be charged with error in refusing to add to the votes cast for Benjamin Welch, Jr., those given for Benjamin C. Welch, Jr., and for Benjamin Welch without the Jr. They had not the means which the court possessed on the trial of ascertaining by evidence aliunde the several county returns, the intention of the voters and the identity of the candidate, with the name on the defective ballots. Their judicial power extends no further than to take notice of such matters of public notoriety, as that certain well-known abbreviations are *92 generally used to designate particular names, and the like. It is enough, probably, to say that the legislature lias not clothed either the State officers or tho subordinate board of inspection with power to hear and determine, by means of evidence aliunde the return, the intention of the voters. The strictness with which these boards should be held to the record before them, is dictated by sound policy and enlightened wisdom.”
It will thus be seen that the court of appeals did hold that the State canvassers, governed, as we have seen, by a similar statute to the one applicable to the board of county canvassers, committed no error in refusing to add to the votes for Benjamin Welch, Jr., those returned as cast for Benjamin C., and for Benjamin without the Jr., and so this decision is entitled to great weight, and reflects considerable light in arriving at a correct conclusion. I invite also particular attention to the case of Morgan v. Quackenbush, 22 Barb. 72, as showing that the respondent could not award and count the votes of Andrew C. for Andrew H., nor assume that such votes were intended for one and the same person, in the absence of proof other than appeared on the face of the returns, and which copld not be given before, or received by, it. If it had so much power, why not as well assume that the votes for Andrew H. Getty were intended for Andrew C. Getty ?
It is urged on the part of the respondent, that a middle letter is no part of a man’s name, and may be regarded as surplusage; that the law knows and recognizes but one Christian name. This is an elementary principle, well understood,' and substantiated by innumerable authorities. For instance, a tax levied and assessed to Henry D. Van Voorhis, when the real name was Henry H. Van Voorhis, was held good and collectible, it appearing that Henry H. was the person intended (Van Voorhis v. Budd, 39 Barb. 479).
*93 So a person with one or more middle letters, making a contract or incurring an indebtedness, or creating an obligation, verbal or written, can properly be sued by stating simply the Christian name, without the insertion of the middle letter, or either of them (if more than one), and it would not avail such person to say, “ you have not sued me by my right name,” so long as it appears that he is the same person who signed the instrument or incurred the debt. I need not multiply or furnish any authorities on this point; no lawyer will question it.
A middle letter, however, is often important as distinguishing a person really intended to be spoken of from another person having the same Christian and the same surname. It often occurs, in the same town and in the same village, that two or more persons can be found by the same Christian name and the same surname ; and so, when spoken of, are readily known and distinguished, the one from the other, from the fact that each has a middle letter. So the word “ junior,” at the end of a surname, is no part of the name itself, but indicates that .there is another, older, person by the the same Christian and surname, and the “Jr.” is added to distinguish the one from the other. The difficulty, however, is that this well understood elementary principle has no application to or effect upon the question involved in a proceeding like the one under consideration.
It only remains in conclusion to determine what effect shall be given to the affidavits used upon this motion. This- proceeding, as before stated, is taken under the Laws of 1880, chap. 460. Its purpose and object are clearly apparent from the language employed. It was to furnish a speedy and summary remedy to compel a board of canvassers to do its plain and apparent duty ; in other words, to compel it to do what the law requites without any order or direction *94 of the court. In such a proceeding, the court before which the same is instituted has no greater power than the board itself. It cannot take proof as to the title of any applicant to an office, or receive any evidence which could not in the first instance "have been properly taken and received by the board. In a word, it is as effectually prohibited from undertaking to go behind the returns as is the board of canvassers. The only question connected with such affidavits, or the effect of any, which should be given to them, arises from the fact that the relator, in his affidavit, goes further than to bring to the attention of the court what appears upon the face of the returns as presented to the respondent, and upon which its action was based, and asserts that Andrew 0. Getty was in fact a candidate and running for the office of coroner in Greene county, at the last election. This alleged fact as to the candidacy of Andrew 0., is contradicted by the opposing affidavits, and the facts conclusively established that there was no such candidate running for that or any other office in the county. The opposing affidavits go further and show very clearly that the votes returned for Andrew C. Getty were really intended for Andrew EL Getty, who was a candidate, and that the difficulty occurred in consequence of a mistake in the printing and circulation of the tickets, which was not ascertained in time to preven t their being used in certain localities.
But, as I have said, such opposing affidavits can only be considered on this motion, if at all, simply to contradict the statement in the relator’s affidavit as to the candidacy of Andrew C. Getty. Their use, then being restricted, I do not see that any importance can be given to them. A person may run for an office without receiving any nomination, or without its being generally understood that he is a candidate; and so persons may vote for any individual for any office, *95 whether a candidate or not. After all, we are brought back to the original question as to the powers and duties of the defendant, and its right to assume any fact contrary to what appears upon the face of the returns with which it is presented, and on which it is called upon to act, independent of, and in disregard of any proof which may be offered tending to impeach or contradict the same.
For the reasons which I have stated, I am forced to the conclusion that the relator is entitled to the relief sought by - this motion. I confess that it is entirely in opposition to the impression or opinion previously entertained by me. Indeed, at the close of the argument, having distinctly in mind the well settled principle that the middle letter was to be regarded as no part of a name, and in law to be treated as surplusage, my impressions were that the respondent had acted properly and that it would require of me but little time or labor to demonstrate that such im - pressions were correct. But in examining the authorities with great care, I soon found the question presented was not easy of solution, an'd that it required a great amount of time, as well-as research, to satisfy my own mind.
The motion is granted, with $10 costs.